LIEBETREU *v.* LIEBETREU.

1. HOMESTEADS—ABANDONMENT BY WIFE—EVIDENCE—SUFFICIENCY.
   Evidence *held*, insufficient to show an abandonment of the homestead by the wife of the owner during the husband's lifetime.

2. SAME — LAND CONTRACTS—SPECIFIC PERFORMANCE—EVIDENCE— SUFFICIENCY.
   Evidence *held*, insufficient to establish an oral contract for the sale of a portion of the homestead, which could be enforced by decree for specific performance.[1]

Appeal from Wayne; Perkins, J., presiding. Submitted April 5, 1917. (Docket No. 40.) Decided September 27, 1917.

Bill by Wilhelmina Liebetreu and others against Anna M. Liebetreu and others for the partition of certain real estate. Defendants filed an answer in the nature of a cross-bill for the specific performance of a land contract. From a decree for defendants, plaintiffs appeal. Reversed.

*Silas E. Champe,* for plaintiffs.

*Lloyd L. Axford, Henry W. Axford* and *Max Hulett,* for defendants.

STEERE, J. This suit was begun by a bill for partition of lot 18 in Weitzel's subdivision of the city of Detroit, between the heirs of August Herman Liebe-

[1] On conveyance of homestead by husband after abandonment by wife, see notes in 8 L. R. A. (N. S.) 565; L. R. A. 1915D, 551.

As to power of husband without wife's consent to abandon homestead or to convey the premises by his sole deed after abandonment, see note in 37 L. R. A. (N. S.) 807.

As to validity of conveyance or incumbrance of homestead by wife after abandonment by husband, see note in 36 L. R. A. (N. S.) 1024.

treu, who died intestate on December 16, 1911, seised in fee of the property, which had been his home for many years. The lot lies on the west side of Eighteenth street, with a frontage of 50 feet, extending back that width for 150 feet. The serious matter in difference between these parties is, however, the title to the southerly 22.2 feet of said lot, claimed by defendants under an oral contract of purchase, accompanied by possession. Plaintiffs are the widow, Wilhelmina, and the two living children of August, while defendants are the widow and minor child of his deceased son, Ernest.

August Herman, the deceased, bought this lot in 1873. It was thereafter the home of himself and family for many years. Just when he moved upon it, and its condition at that time, are left by the record to conjecture; but the dwelling house upon the lot, called by witnesses "the old homestead," which he, with members of his family, all or part of them, occupied until he died, was located on the north 27.8 feet of the lot, and a small building, called a "shanty," was located in later years upon a portion of the remaining southerly 22.2 feet. An old acquaintance of deceased testified that the latter first lived on the lot in a shanty, and then moved it over on the other side of the lot. While the ages of members of the family and the dates of many events testified to are not given, it is shown that August and his wife had three children, Selma, Albert, and Ernest, who were all living, of mature years, and had married when the father died. A sister-in-law of Ernest ventured the belief that he was married about two years before 1910. Selma and Albert had married and gone to homes of their own long before—just when is left to inference; but Selma, who it was claimed separated from her husband, returned with four children to live with the old folks about the time Ernest married, and Albert's wife died in

November, 1909, when the mother, Wilhelmina, went and stayed at his home to help him out, as he states, "so I would not be alone." When Ernest was married, he took his wife to his father's home, where they remained about two months, and then moved into the "shanty," where they remained for a time, and about April, 1910, he moved the shanty to the back of the lot and purchased a house, which he placed on the south 22.2 feet, making water and sewer connections, etc., and occupied it as his home thereafter; defendants continuing to live there following his death.

Selma, who was administratrix of her father's estate, demanded rent of defendant Anna, or payment of interest on a note for $1,500 which Ernest had given his mother, and trouble developed, which led to this bill for partition. Answers were filed by and in behalf of defendants, with cross-bills, asking specific performance by plaintiffs, as August's heirs, of a claimed oral land contract, defined in their cross-bills as follows:

"That prior to the 1st day of January, 1910, the said August Herman Liebetreu and Wilhelmina Liebetreu were seised in fee simple of the lands described in paragraph 1 of complainant's bill, and occupied the northerly 27.80 feet thereof; that on or about January 1, 1910, the said August Herman Liebetreu and Wilhelmina Liebetreu agreed to and with the said Ernest Liebetreu, their son, now deceased, that if he the said Ernest Liebetreu would improve the southerly 22.20 feet of said premises with a dwelling house, and use and occupy the same for a home for himself, they would convey the premises last above described to said Ernest Liebetreu; that pursuant to such agreement the said August Herman Liebetreu delivered possession of said premises last above described to said Ernest Liebetreu, and on or about April 1, 1910, the said Ernest Liebetreu purchased a dwelling house and caused the same to be moved upon the premises last above described, and connected the same with city water and sewer, and from that time to the time of his

death used and occupied the same as a home for himself, this defendant, the said Ervin Ernest Liebetreu, and Anna M. Liebetreu, and since the death of said Ernest Liebetreu this defendant has been in possession of said premises, claiming to own the same in behalf of himself and the said Anna Liebetreu as heirs at law of said Ernest Liebetreu, deceased."

Full performance on the part of Ernest at an expenditure of about $1,800, and continuous possession of the premises, were alleged. Pleadings were completed by answers to the cross-bills and replications. Upon the record evidence of August's title in fee absolute and the unquestioned kinship shown, the title passed upon his death to his surviving wife and three children, as the probate court found and assigned—a one-third, or three-ninths, to the widow, Wilhelmina, and two-ninths each to the children, Selma, Albert, and Ernest.

To prove this oral contract of sale of the part of lot 18 claimed by defendants, they called three witnesses to admissions of deceased, whose testimony, to that point, is as follows:

Frank Drezen, who connected the house Ernest moved upon the lot with the public sewer, testified that when he got it dug he called the old gentleman over to see the job, and he replied:

"Frank, I know nothing about that; it don't belong to me; it belongs to Ernest. He will pay you."

Michael Schultz, an old acquaintance, who once worked for deceased, told where Ernest's house was located, and said:

"Ernest's father told me he had given Ernest that lot."

Augustus Steppke testified that once, after lunch, he talked with deceased about different things, and in the conversation the latter said of the property where Ernest's house stood:

"This don't belong to me; it belongs to my son. He bought the house and lifted it over to this lot, and he is going to fix it up to suit himself. I have nothing to do with it."

The testimony of two of these witnesses indicates the house and its improvements constituted the subject of discussion, rather than the ownership of the land. Schultz's testimony tends to prove a consummated gift, rather than a contract to convey, and the record is totally barren of any testimony connecting Wilhelmina, deceased's wife, with the alleged oral agreement of January 1, 1910, or one of any other date. Concededly, if this lot was the homestead of deceased and his wife, any contract, to which she was not a party, made by him to sell and convey all, or any portion, of it, was of no validity.

In avoidance of this, it is claimed that lot 18 was not her homestead at that time, because she had left her husband on January 1, 1910, having gone in November, 1909, to live with Albert, where she made her home until her husband died. We see little force in this. There is no evidence that she went contrary to her husband's wishes, or without his consent. Their daughter had returned home with her children, and remained with her father. Albert's wife had died, and she went and stayed with him, as he testifies, "to help me out, so I would not be alone. She returned to her home frequently. She went home every week." A neighbor, named Elizabeth Blazer, testified that the relations between the old people were friendly; that Mrs. Liebetreu lived with Albert, and visited her home about every week; that she was an old lady, and it was hard for her to walk that distance, and "she told me her son needed somebody to live with him, and she might as well go, because her daughter and children were at her home with the father, were living to home, and he would not be alone." Even though there was

friction in the family, as is intimated, and she preferred to be with their son, the circumstances shown negative the proposition that she had abandoned their homestead, or surrendered any of her rights as a wife. Ernest paid his father nothing for the land he occupied, so far as is disclosed, and paid no taxes upon any portion of lot 18, either before or after his father's death, for the lot was always taxed in its entirety, and the taxes paid by August or his estate. Their intentions and expectations as to a sale or donation of a portion of the old homestead lot, to which the mother was not a party, even though Ernest relied and acted upon them, falls far short of a legal contract for the sale of real estate which can be inforced by a decree for specific performance.

At the conclusion of the evidence the trial judge announced the following conclusion as to defendants' claim of title:

"I don't believe there is any testimony here which would justify the court in finding as a matter of fact that there was a contract for the transfer of this property. The parties who were living there as a family had held this one lot, and they were all trying to make the best use of it they could, and they were doing pretty successfully I should imagine; each member of the family was using the lot in such a way as to get the best out of it."

Other features of the case were discussed by the court, and counsel were told:

"I think you may prepare a decree to that effect, along the lines of this announcement."

It was also then suggested by the court that each counsel prepare a statement showing what defendants' share in lot 18 would be in case specific performance were decreed, and what it would be in case specific performance was denied, and an order entered for partition, giving defendants credit for improvements

made by Ernest. These were furnished. Plaintiffs then conceded, and now concede, that under the ruling in *Fenton* v. *Miller,* 116 Mich. 45 (74 N. W. 384, 72 Am. St. Rep. 502), defendants are entitled to the value of the improvements, amounting to "about" $1,800, made by Ernest in connection with the house he moved on the lot, less any insurance, rent, taxes, etc., not paid by him, which it is claimed should be deducted from the same. Later the court delivered another oral opinion, radically modifying that previously announced, followed by a decree granting defendants specific performance of the claimed oral land contract, ordering the northerly 28.8 feet of the old homestead sold, and, after paying costs, expenses, etc., that the proceeds be divided—15/27 to Albert, 6/27 to Selma, 2/27 to Anna, Ernest's widow, and 4/27 to his minor son, Ervin Ernest. It was shown at the hearing that the mother, Wilhelmina, had died on May 19, 1915, after this bill was filed, and it may have been conceded, although the record does not so disclose, that she left her estate to Albert.

As before intimated, we cannot conclude that defendants have sustained the burden of proof required to establish an oral contract for the sale of land, which can be enforced by decree for specific performance, and that, when August Liebetreu died intestate, seised of said lot 18, it was inherited by his heirs named, and in the proportions named, by the probate court. Apparently the property is such that its partition amongst the heirs is impractical, and it should be ordered sold as asked by plaintiffs. That Ernest's heirs are entitled to credit for the approximately $1,800 improvements made upon the property, less proper countercharges, under *Fenton* v. *Miller, supra,* is conceded.

As stated in the briefs of counsel, the primary object of this appeal is a final adjudication upon the title to the southerly 22.2 feet of said lot 18. While de-

tails of an accounting between the parties are argued and their determination asked, we are impressed, from the tenor of counsel's briefs, that, with the question of title out of the way, counsel will adjust most of them, if their clients permit, and where any substantial disagreements arise the matter should first be presented to the trial court, under conditions as they then exist. The record is not such that this court can now understandingly and satisfactorily decree as to details.

The decree of the lower court is therefore reversed, with costs to plaintiffs, and a decree may be entered here as above indicated, authorizing either party to apply to the trial court for such further proceedings in harmony with this opinion as they may be advised.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, BROOKE, and FELLOWS, JJ., concurred.